The BOARD OF EDUCATION OF THE COUNTY OF KANAWHA, Plaintiff,

v.

MICHAEL M., a minor, Stephen M. and Teresa M., Parents of Michael M., Defendants.

No. Civ.A. 2:99–0609.

United States District Court, S.D. West Virginia, Charleston Division.

April 26, 2000.

Claudia W. Bentley, Bowles Rice McDavid Graff & Love, Martinsburg, WV, Gregory W. Bailey, Bowles Rice McDavid Graff & Love, Charleston, WV, for plaintiff.

Sandra K. Henson, G. Nicholas Casey, Jr., Lewis, Friedberg, Glasser, Casey & Rollins, Charleston, WV, for defendants.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

During an administrative hearing before the West Virginia Department of Education, Michael M., by his parents Stephen M. and Teresa M. ("parents"), alleged that the Board of Education of the County of Kanawha ("Board") violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, by failing to provide Michael with a free appropriate public education for the 1997–1998 and 1998–1999 school years. The hearing officer agreed with the parents and found that the supplemental home-based educational program that the parents had established for Michael was necessary for him to attain a free appropriate public education. The hearing officer ordered the Board to reimburse the parents for costs related to the home-based educational program incurred in calendar years 1997 and 1998 and ordered prospective reimbursement.

The Board brought this civil action against Michael and his parents pursuant to 20 U.S.C. § 1415(i)(2)(A). The Board requests the court to find that it is not required to reimburse the parents for any costs. It further requests the court to find that the Board may implement Michael's education in accordance with its own previously proposed educational program. The question presented by this action is whether the Board's individualized education program ("IEP") for Michael, which did not contain a supplemental home-based educational program, complied with the Board's obligation under the IDEA.

I.

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also Gadsby v. Grasmick,* 109 F.3d 940, 942 (4th Cir. 1997). The IDEA requires all states receiving federal funds for education to provide to each child with a disability between the ages of three and twenty-one a free appropriate public education that is specifically designed to meet that child's needs. 20 U.S.C. § 1412(a)(1)(A). Congress intended that the IDEA's goals would be accomplished through the public education system. However, the IDEA allows for

private school placement at public expense if the school district lacks the capacity or refuses to provide the services necessary for the child to receive a free appropriate public education. *Id.* § 1412(a)(10)(c); *see School Comm. of the Town of Burlington v. Department of Educ. of Cmwlth. of Massachusetts,* 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (holding that parents may seek reimbursement from the school district for unilateral private placement when the school district's IEP is inadequate and the private placement is appropriate).

At the heart of the statutory scheme is the IEP. School districts are required to develop an annual IEP for each disabled child to effectuate the goal of providing them with a free appropriate public education. *See* 20 U.S.C. § 1412(a)(4). An IEP is a customized model of the child's curriculum and academic goals. The IEP is designed to meet the child's educational needs and to provide periodic monitoring of the child's progress. *Id.* § 1414(d). School officials develop an IEP upon collaboration with teachers and experts, and the child's parents are entitled to participate in the annual development of their child's IEP.[1] *Id.*

At issue in this case is whether the IEP designed by the Board provided Michael with a free appropriate public education.

## II.

Michael is an eight year old Kanawha County, West Virginia boy who was diagnosed with autism at the age of three. Sometime near his fourth birthday in March 1996, Dr. Gretchen Lovett, a child psychologist at the Women and Children's Hospital in Charleston, West Virginia, confirmed that Michael is autistic. Autism is a developmental disorder characterized by significant deficiencies in communication skills, social interaction, and motor control. When Dr. Lovett first met Michael, his communicative ability was severely impaired. He did not make eye contact and Dr. Lovett was unable to attract his attention. Michael also suffered from a severe developmental deficit—his speech was entirely echolalic, meaning that he was merely capable of mimicking sounds that he heard, and he did not demonstrate any awareness of his surroundings.

Since his diagnosis, Michael's parents have been involved in a nearly continuous litigation against the Board. The legal strife began when Michael's parents established for him, at their own expense, a pre-school home-based program using the Lovaas methodology. Under the Lovaas methodology, private instructors use a discrete trial training ("DTT") method wherein the instructor breaks down complex items and concepts into their most basic components and builds upon those components to allow the child to approach more difficult concepts. The Lovaas program is administered at home by two Lovaas therapists. The program is supervised by consultants at the Redwood Learning Center in New Jersey, who come to West Virginia every three months to conduct a one-day workshop for the instructors and the family. The parents asked the Board to incorporate the home-based Lovaas program into Michael's IEP. The Board refused, instead advancing the position that their own pre-school program of approximately two and a half hours per day was appropriate for Michael.

---

**1.** The IDEA encourages the parents and school district to work together to develop an IEP for the child. Because the school district is obligated to provide the child with a free appropriate public education from ages three to twenty-one, parents and school districts will often have a long-standing relationship. Unfortunately, the proliferation of litigation shifts the attention from cooperation to adversariness. Furthermore, because of the specialized educational knowledge that is required to decide what is best for each child's education, courts are not well suited to arbitrate disputes between parents and school districts. Of course, the court recognizes that, although settlement and cooperation is the optimal solution for all parties involved, each party has a right to litigate disputes arising under the IDEA.

Believing the Board's pre-school program inadequate, the parents filed a grievance against the Board in the West Virginia Department of Education. In December 1996, an impartial hearing officer found that the Board's program was inadequate and that the Lovaas program was appropriate for Michael's special needs. Accordingly, the hearing officer also directed that the Board incorporate the Lovaas program into Michael's IEP. The Board brought an action in the Circuit Court of Kanawha County seeking to set aside the hearing officer's decision. On January 15, 1998, the state court upheld the decision of the hearing officer.

Following the December 1996 decision of the hearing officer, the parents and the Board met on several occasions for the purpose of reaching a mutually agreeable IEP for Michael. In January 1997, the IEP committee offered Michael, among other things, twenty hours of discrete trial training in the school setting. The parents believed that the proposed IEP remained inadequate and elected to keep Michael at home and continue his pre-school education using the Lovaas methodology.

At the age of five, Michael was scheduled to begin kindergarten during the 1997–1998 school year. The Board did not complete a new IEP for Michael's kindergarten year until January 6, 1998. The new IEP still did not incorporate Michael's home-based Lovaas program. Nevertheless, Michael began his kindergarten year in January 1998. He attended only fourteen half-days of school, however, before his parents withdrew him. Prior to the start of the 1998–1999 school year, Michael received approximately 30 to 38 hours of one-to-one DTT per week at home using the Lovaas methodology.

After almost two years of meetings, administrative hearings, and court proceedings, Michael finally began attending kindergarten on a continuous basis in September 1998. Michael attended kindergarten during the 1998–1999 school year pursuant to an IEP that was developed on September 2, 1998 and another slightly modified IEP developed on November 20, 1998 ("the IEPs"). As required by the IDEA, the IEPs set forth several annual goals and objectives for Michael. The November IEP listed seven specific annual goals:

(1) Language: Developmental. Increase acquisition of language using an analytical and systematic approach;

(2) Language: Morphology/Syntax. Increase use of sentence structure, inflection, and derivational forms in language appropriately;

(3) Language: Semantics. Increase development, and appropriate use of vocabulary;

(4) Socialization: Pre-school/Primary. Increase development of appropriate, positive relationships with adults and peers;

(5) Task Attention and Completion. Increase focus of attention towards completion of task;

(6) Content Area: Remediation. Increase acquisition and knowledge of basic concepts in content area through remediation and reinforcement; and

(7) Accessibility. Development of skills or techniques needed for student to access educational materials and perform necessary self-care in the school setting.

*See* November 20, 1998 IEP. Within each of the annual goals were several proposed objectives for Michael to achieve during the school year. For example, under the goal "Language: Morphology/Syntax," were the following objectives: Michael "will with 80% accuracy: (1) Demonstrate comprehension and use of various verb forms to include "-ed" and "-ing" as well as present progressive; and (2) demonstrate the ability to use irregular plural forms." *Id.* The IEPs also indicated the special education and related services that Michael would receive from the school. Included within the 1950 minutes per week that Michael attended school, he received three hundred minutes of "skills remedia-

tion and maintenance required skills" and sixty minutes of speech therapy in a separate setting. In addition, Michael received thirty minutes per month of occupational therapy.

The IEPs are at the very heart of the present dispute between the parties because the supplemental home-based Lovaas program, which the parents consistently sought to incorporate into the Board's program, was still notably absent from the IEPs. Although the parents maintained their belief that the Board's program was inadequate, Michael attended school on a full time basis during the 1998–1999 school year pursuant to the IEPs. At the parents' expense, however, Michael continued to receive fifteen to eighteen hours per week of at home supplemental Lovaas training in the evenings and on weekends.

There is no dispute that Michael has made tremendous progress since he first began the Lovaas program in March 1996. In particular, he made significant progress during the 1998–1999 school year when he participated in both the Board's IEP and the home program. Michael now speaks in spontaneous phrases of six to eight words in length, is able to converse with his family and friends, and has demonstrated academic ability in reading and spelling. Michael is now capable of meaningful speech and can focus on the meaning of a question and respond accordingly. He also can remember information and even retell stories. His mother agrees that the 1998–1999 school year was a very successful year for Michael.

### III.

In December 1998, the parents filed another grievance with the West Virginia Department of Education alleging that the Board's program for Michael was inadequate. The parents sole argument at the administrative hearing and in this civil action is that the IEPs did not contain a supplemental home-based Lovaas program. Accordingly, the parents seek reimbursement for their expenses on the ground that the Lovaas program is necessary for Michael to attain a free appropriate public education. An impartial hearing officer with the State Department of Education conducted a two-day due process hearing, and on June 4, 1999, the hearing officer again found that the Board's IEPs were inadequate and that the home-based Lovaas program is necessary for Michael to obtain a free appropriate public education under the IDEA. The hearing officer ordered the school district to reimburse Michael's parents for the following costs related to the home program:

(1) $6,349.15 for costs incurred in calendar year 1997;

(2) $17,504.20 for costs incurred in 1998;

(3) Costs due on or after March 23, 1999 upon a showing of the proper documentation; and

(4) Prospective reimbursement for:

(a) 15 hours of home therapist services at a rate not to exceed $15 per hour;[2]

(b) Consultation services from a qualified provider at a rate not to exceed $60 per hour, plus expenses, and $800 for a workshop day;

(c) $52.50 per year for supplies; and

(d) Long distance phone charges incurred with the Lovaas consultant.

After the administrative decision, the Board commenced this civil action pursuant to 20 U.S.C. § 1415(i)(2)(A). During a status conference on November 9, 1999, the court bifurcated this action into two stages. First, the court determined that the Board bears the burden of proving that Michael's IEPs were reasonably calculated to provide Michael a free appropri-

---

**2.** The Board has the option of discounting up to five hours of the home-therapist services if it provides comparable services at the school.

ate public education under the IDEA.[3] The court also advised the parties that if the Board meets its burden of proving that the IEPs were adequate, then the inquiry is finished; it does not matter whether the supplemental home-based Lovaas program was appropriate or helpful because the Board already met its obligation under the law. Second, if the Board fails to meet its burden of proof, the parents then bear the burden of proving that the supplemental home-based program was appropriate under the IDEA. At the direction of the court, the parties have submitted briefs addressing the issue of whether Michael's IEPs were adequate under the law. The full administrative record was submitted to the court for review, and the parties have agreed to rely on the court's review of the administrative record below. *See Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994) (holding that if neither party indicates its desire to present additional evidence in an IDEA case, the district court is entitled to assume that the parties intend that the case be decided on the basis of the administrative record).

## IV.

Under the IDEA, parents who file a grievance are entitled to an impartial due process hearing conducted by the State or local educational agency. *See* 20 U.S.C. § 1415(f)(1). Any party aggrieved by the findings and decision of the hearing officer is entitled to bring a civil action in a state court or a federal district court. *See id.* § 1415(i)(2)(A).[4] Section 1415(i)(2)(B) provides that:

In any action brought under this paragraph, the court—

3. The court's explanation for placing the burden of proof on the Board is discussed at pages 608–09, *supra*.

4. Courts frequently refer to actions pursuant to 20 U.S.C. § 1415(i)(2)(A) as if they were appeals from an administrative agency to a federal district court. It is quite clear, however, that it is an independent civil action.

(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

*Id.* § 1415(i)(2)(B).

■ This court must conduct an independent review of the administrative record; however, the Fourth Circuit requires courts to give deference to the findings of the administrative hearing officer and has held that "administrative findings in an IDEA case 'are entitled to be considered prima facie correct.'" *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 1000–01 (4th Cir.), *cert. denied*, 522 U.S. 1046, 118 S.Ct. 688, 139 L.Ed.2d 634 (1998) (quoting *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir.1991)). In *Doyle*, the court held that "in reviewing state administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving due weight to state administrative proceedings." *Doyle*, 953 F.2d at 103. "Due weight" is accorded to the hearing officer because, as the *Hartmann* court noted:

These principles reflect the IDEA's recognition that federal courts cannot run local schools. Local educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment.

*Hartmann*, 118 F.3d at 1001; *see also Springer v. Fairfax County Sch. Bd.*, 134 F.3d 659, 663 (4th Cir.1998) ("[F]ederal

Courts are required to conduct an independent review of the administrative record and accept and consider additional evidence at the request of either party. To the extent that courts give deference to the findings of the administrative hearing officer, deference is merely a judicial construct that is employed to aid the decisional process.

courts must avoid the temptation 'to substitute their own notions of sound educational policy for those of the school authorities which they review.' " (quoting *Board of Educ. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982))).

In addition, the Fourth Circuit has stated that the party aggrieved by the hearing officer must properly bear the burden of proving that the administrative decision was erroneous. *See Barnett v. Fairfax County Sch. Bd.,* 927 F.2d 146, 152 (4th Cir.1991). Accordingly, the Board bears the burden of proving that the hearing officer's decision was erroneous.

### V.

A free appropriate public education is statutorily defined as:

[S]pecial education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate public preschool, elementary, or secondary school education in the State involved; and

(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8). Although defined by statute, that definition is too nebulous for effective application by the courts. In determining whether a particular school district's educational program provides a child with a free appropriate public education, courts are often required to analyze and comprehend voluminous expert testimony and documentation concerning specialized teaching goals, methods, and standards of education. The IDEA does not set forth any objective criteria to guide courts in determining whether a child is receiving a free appropriate public education. Accordingly, the decisions by various courts interpreting the IDEA are often inconsistent and decided on an ad-hoc basis.[5]

In *Board of Education v. Rowley,* the Supreme Court provided some guidance to lower courts. *Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). In *Rowley,* the parents of Amy, a gifted eight year old deaf child, sued a New York school board, alleging her right to receive a sign-language interpreter in all of her classes. Even with the use of an amplified hearing aid, Amy was only able to hear a portion of the oral communication in her classroom. Because of Amy's intellectual ability, however, she was still able to achieve average grades and successful completion of her grade level.

The Supreme Court established a two-part test for determining whether a child is receiving a free appropriate public education:

First, has the State complied with the procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Id.* at 206–07, 102 S.Ct. 3034. In adopting a minimal standard of appropriateness, the Court rejected the lower court's decision that a child should be given an opportunity to achieve full potential commensurate with the opportunity provided to other children. According to the Court, a school

---

5. *See* LaDonna L. Boeckman, *Bestowing the Key to Public Education: The Effects of Judicial Determinations of the Individuals with Disabilities Education Act on Disabled and Nondisabled Students,* 46 Drake L.Rev. 855, 880 (1998) ("The IDEA fails to set any standards or guidelines for judges to utilize when asked to intervene. The result is often a quagmire of inconsistent and inequitable opinions.").

district's educational program is adequate so long as the program is reasonably calculated to confer some educational benefit. If the child is being educated within the public system, the child receives sufficient educational benefits if the child's IEP is "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 188, 102 S.Ct. 3034. Thus, although Amy could only hear less than one half of the classroom discussion, because she was performing at an average level and was advancing from grade to grade, her IEP was appropriate under the IDEA.

■ Although *Rowley* sets a low standard for school districts, a school district cannot discharge its duty under the IDEA by providing a program that provides only de minimis or trivial academic advancement. *See Carter v. Florence County Sch. Dist. Four*, 950 F.2d 156, 160 (4th Cir. 1991). The IDEA, however, does not require "the furnishing of every special service necessary to maximize each handicapped child's potential." *Rowley*, 458 U.S. at 199, 102 S.Ct. 3034. Instead, school districts are merely required to provide a "basic floor of opportunity" to every child with a disability. *Hartmann*, 118 F.3d at 1001.

■ *Rowley* provides some guidance for determining a free appropriate public edu-

cation by setting forth a low standard of achievement as all that Congress required in enacting a comprehensive statute designed to address the problem of inadequate education for children with disabilities. However, the phrase "reasonably calculated to provide some educational benefit" is only slightly less nebulous than the statutory definition contained in the IDEA itself. The Supreme Court acknowledged the potential difficulty in applying the test but suggested that regular grading and advancement systems would offer satisfactory guidance to the courts. Although regular grading and advancement systems are a useful guidepost for the courts, that model becomes less useful in the context of a child with autism or similar disability. In *Rowley*, Amy had difficulties hearing, but otherwise was a child of ordinary talents and ability. In Michael's situation, the concept "educational benefit" must embrace more than academic subjects. To determine whether an autistic child is receiving a free appropriate public education, the court must examine the IEP to determine whether it is reasonably calculated to provide benefit in academic areas and non-traditional areas critical to the child's education.[6] Improvement in these areas is not as easily quantified through regular grading and advancement systems. *See* Sharon C. Streett, *The Individuals with Disabilities Education*

**6.** An expansive view of the term "educational benefit" is supported by the Code of Federal Regulations. Section 300.26 of Title 34 of the Code of Federal Regulations offers several pertinent definitions:

(a) General.

(1) [T]he term special education means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with disability, including—

(i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (ii) Instruction in physical education.

(2) The term includes . . .

(i) Speech-language pathology services, or any other related service . . . ; (ii) Travel training; and; (iii) Vocational education . . .

(b) Individual terms defined . . .

(2) Physical education—

(i) Means the development of—(A) Physical and motor fitness; (B) Fundamental motor skills and patterns . . .

(ii) Includes special physical education, adapted physical education, movement education, and motor development . . .

(4) Travel training means providing instruction, as appropriate, to children with significant cognitive disabilities, and any other children with disabilities who require this instruction, to enable them to—(i) Develop an awareness of the environment in which they live; and (ii) learn the skills necessary to move effectively and safely from place to place within that environment (e.g. in school, in the home, at work, and in the community).

34 C.F.R. § 300.26.

*Act,* 19 U.Ark. Little Rock L.J. 35, 45 (1996) (describing the need to interpret "educational benefit as including the child's socialization, adaptive behavior, speech and communication, and mobility").

## VI.

Having provided the appropriate standard by which to judge whether the Board's IEPs were consistent with its obligations under the IDEA, the court, although recognizing the lack of precision in applying *Rowley* to Michael's situation, applies the two-part test to determine whether the Board's IEPs were adequate. With respect to the first prong, the parents have made no claims regarding procedural or technical violations of the IDEA. Turning then to the second prong, the sole issue before the court is whether the IEPs were reasonably calculated to enable Michael to receive some educational benefit.

### A.

■ The court must first address the issue of which party bears the burden of proof. The Fourth Circuit has not resolved the issue of which party bears the burden of proving that the IEP is, or is not, reasonably calculated to provide some educational benefit. The circuits that have addressed this issue are split. The Second, Third, Eighth and Ninth Circuits place the burden upon the school district. *See Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 122 (2d Cir.1998); *E.S. v. Independent Sch. Dist. No. 196,* 135 F.3d 566, 569 (8th Cir.1998); *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 533 (3d Cir.1995); *Clyde K. v. Puyallup Sch. Dist. No. 3,* 35 F.3d 1396, 1398 (9th Cir.1994). The Fifth, Sixth, and Tenth Circuits place the burden of proof on the party seeking to change the IEP. *See Salley v. St. Tammany Parish Sch. Bd.,* 57 F.3d 458, 467

(5th Cir.1995); *Doe v. Board of Educ. of Tullahoma City Sch.,* 9 F.3d 455, 458 (6th Cir.1993); *Johnson v. Independent Sch. Dist. No. 4 of Bixby, Tulsa County, Okl.,* 921 F.2d 1022, 1026 (10th Cir.1990).

This court finds that the burden of proof rests on the school district. *See Brian S. v. Vance,* 86 F.Supp.2d 538, 539 (D.Md. 2000) (holding that the school district bears the burden of proof when the parents initially reject the IEP); *Wall v. Mattituck–Cutchogue Sch. Dist.,* 945 F.Supp. 501, 510 (E.D.N.Y.1996); *Lascari v. Board of Educ. of Ramapo Indian Hills Regional High School Dist.,* 116 N.J. 30, 560 A.2d 1180, 1188 (1989). The New Jersey Supreme Court's reasoning in *Lascari* is persuasive. First, the basic obligation to provide a disabled child with a free appropriate public education rests with the school district. It is an affirmative duty imposed by statute. *See Lascari,* 560 A.2d at 1188. Although the parents are entitled to participate in meetings for the purpose of developing an IEP, the ultimate decision concerning the IEP rests with the school district. *Cf. Vance,* 86 F.Supp.2d at 544 ("Since the IEP is supposed to be a joint enterprise, it is debatable whether an IEP can even be said to exist if a parent has never agreed to it."). Second, this "result is also consistent with the proposition that the burden of persuasion and of production should be placed on the party better able to meet those burdens." *Lascari,* 560 A.2d at 1188. The school district has greater sophistication in handling such matters because it relies on expert opinion and documentation in developing its IEP and has better recourse to the records pertaining to the child.[7]

As the court in *Vance* notes, placing the burden of proof on the school district "in no way reflects a lack of deference to the

---

7. This logic also leads to the court's conclusion that the burden of proving the reasonableness of a private placement falls on the parents if the school district is unable to meet its own obligation and the parents seek reimbursement for private placement. In that situation, the parents essentially step into the shoes of the school district, constructing a plan to provide the child with educational benefit and having access to the appropriate documentation.

expertise of the school authorities." *Vance,* 86 F.Supp.2d at 544. Courts can acknowledge the expertise of school officials when determining the weight to be accorded their testimony and reasoning in support of the IEP. That, however, does not mean that the school district:

> should not have to demonstrate to an impartial fact-finder, at least in the first instance, that the proposed goals and objectives of the IEP address the student's needs, or that the IEP delivers services to those needs in a way that will provide progress towards those goals and objectives, or that the proposed criteria to evaluate the child's progress are in place and can actually measure the extent to which objectives are obtained.

*Id.*

### B.

Upon careful review and consideration of the administrative record and the parties' briefs, the court finds that the Board has not met its burden of proving that Michael's IEPs were adequate under the IDEA. The court will address the appropriateness of the Lovaas program adopted by the parents, and whether the parents may be reimbursed for their expenditures pursuant to that program, in a subsequent order of the court after further proceedings. At this time, the court merely concludes that the Board has not met its burden of proving that Michael's IEPs were reasonably calculated to provide him a free appropriate public education.

■■ The appropriate inquiry is whether the Board's IEPs, at the time of creation, were reasonably calculated to provide some educational benefit to Michael. Courts should not judge an IEP in hindsight; instead, courts should look to the

IEP's goals and methodology at the time of its creation and ask whether it was reasonably calculated to provide educational benefit. *See Adams v. State of Oregon,* 195 F.3d 1141, 1149 (9th Cir.1999). Ultimate success is not the touchstone of the inquiry; reasonable calculation is all that is required under the law.[8]

The Board unnecessarily complicates the inquiry by focusing on Michael's success and the fact that during the 1998–1999 school year he participated in both the home program and the Board's program. The Board laments the difficulty of "proving a negative;" that it cannot possibly separate out the benefits of the two programs. As the hearing officer stated, "[t]o separate the benefits of one from the other now is like being asked to separate grains of salt and pepper." Adding to the difficulty inherent in the Board's misdirection is that Michael received five hours per week of DTT instruction in the school setting from his personally assigned autism mentor. His autism mentor utilized the curriculum materials provided by the home-based Lovaas consultants that the parents hired and paid for at their own expense.

Both parties, however, miss the point by focusing on Michael's success during the 1998–1999 school year. Although progress may be an indicator of whether an IEP was reasonably calculated to provide a free appropriate public education, it is ultimately irrelevant whether the child did in fact make progress pursuant to the IEP.[9] If the child did not make substantial progress, or even if the child regressed during the school year, the school district still meets its statutory mandate so long as the school district can prove that the IEP, when it was created, was reasonably calcu-

---

**8.** Although a school district can meet its statutory obligation even though its IEP proves ultimately unsuccessful, the fact that the program is unsuccessful is strong evidence that the IEP should be modified during the development of the child's next IEP. Otherwise, the new IEP would not be reasonably calculated

to provide educational benefit in the face of evidence that the program has already failed.

**9.** This is particularly so when the child participates in two programs and neither party can provide a direct nexus between the benefits and its own program.

lated to provide some educational benefit. Focusing the inquiry at the time of creation eliminates any problem of requiring the Board "to prove a negative."

■ For a school district to sustain its burden of proving that its IEP was reasonably calculated at the time of creation to provide some educational benefit, the school district cannot simply provide conclusory statements that the IEP was adequate. The school district must show the following concrete information. First, the school district must show that it set forth the proper elements of the IEP. The IEP must include a statement containing: (1) the child's present levels of educational performance, including how the child's disability affects the child's involvement and progress in the general curriculum; (2) measurable annual goals, benchmarks or short-term objectives; (3) the special education and related services that will be necessary to meet the annual goals, including the projected date for the beginning of the services, and the frequency, location, and duration of those services; (4) the extent of the child's participation with non-disabled children; (5) any modifications in the administration of state assessments of student achievement; and (6) criteria for evaluating whether the annual goals and short-term objectives are being met. *See* 20 U.S.C. § 1414(d)(1)(A).

Second, the school district must show that the annual goals, benchmarks, and short-term objectives set forth in the IEP were reasonable. The goals must be realistic and attainable, yet more than trivial and de minimis. The school district can show that the goals were reasonable through the use of experts, who may include administrators, consultants, teachers, mentors, and psychologists. Those experts should offer opinions, supported by materials and experience, as to what are reasonable goals for a child of similar age and disability. For example, there may be literature that offers examples of concrete tasks and skills that are appropriate for an eight year old child with autism. In the alternative, experts may state an opinion that a certain task is a reasonable and attainable goal for a child with a certain disability.

In developing reasonable annual goals, the Board must, as required by statute, look to the standards of the state educational agency. *See id.* § 1401(8). The school district must consider the state educational standards for a child of similar age and grade. If the goals for the disabled child are not similar to the objective state criteria for a child of similar age and grade, the school district must state the reasons for the discrepancy. Disabilities and individual characteristics will often necessitate modified annual goals for these children. The school district, however, must specify the reasons why the child's disability makes it impossible to meet the objective state criteria.

Third, the school district must show that the methodology that it employed was tailored to meet the annual goals, benchmarks, and short-term objectives set forth in the IEP. Stated differently, the special education and related services must be tailored to reasonably accomplish the goals in the IEP. Once again, the school district can prove this through expert testimony. Experts may opine that the methodology is generally accepted in the educational community for similarly situated children and recognized by other educational experts as a reasonable approach to providing similarly situated children with educational benefits.

■ Applying these guidelines to the proof offered by the Board in this case, it is clear that the Board has not sustained its burden of proof. It is possible that the Board's IEPs were in fact reasonably calculated to provide some educational benefit under the minimal standard set forth in *Rowley*, but analysis of the record reflects a failure of proof. The Board sufficiently set forth the statutorily required elements of an IEP. The IEPs adequately provided several annual goals and objectives for Mi-

chael during the school year, and the parents do not contest the reasonableness of those goals. Instead, the entire dispute rests on the issue of whether the methodology in the IEPs was reasonably tailored to accomplish the goals set forth in the IEPs. On this point, the Board offers conclusory opinion at best. At worst, the Board offers expert testimony that concedes that Michael's IEPs were inadequate in the absence of the home program.

Betsy Fleshman, Michael's Itinerant Autism Teacher, testified on behalf of the Board during the administrative hearing that the IEPs were adequate even if Michael's home-based program was eliminated. Tr. Vol. II, p. 68. When directly asked whether the Board's IEPs were adequate, Fleshman responded, "[f]rom what I have seen in the improvement in Michael this year, [and] what the county system and their program [provide], yes." *Id.* The problem with her opinion is two-fold. First, Fleshman focuses on Michael's improvement. As stated above, success is not the touchstone. Second, Fleshman provided absolutely no support for her blanket statement. She did not provide any supporting materials or testimony that leads to a conclusion that the methodology in the IEPs was reasonably tailored to accomplish the goals in the IEPs. As an example of the deficiency, there was no testimony regarding whether the methodology is generally accepted by the educational community or recognized by other educational experts as reasonable.

In addition, Fleshman earlier contradicted herself and acknowledged that the home program was necessary for Michael to receive a free appropriate public education.

Q. Do you feel that the Lovaas at-home program for [Michael] is necessary for him to receive a free, appropriate public education in Kanawha County schools?

A. Well, yes. There are so many aspects, you know, for an appropriate education. I think that's only part of what a child needs.

TR. Vol. II, p. 63.

The Board next elicited testimony from Kelly Taylor, Michael's kindergarten classroom teacher. Taylor provided testimony regarding Michael's accomplishments and the success and progress that he achieved during the year. The testimony, however, lacked any direct reference to the IEPs or to particular examples of connections between the goals and objectives in the IEP and methodology contained therein.

The Board also called Kelly George, Michael's autism mentor. George merely provided testimony as to how she monitored Michael's progress during the school year through the use of checklists and a notebook. She offered no testimony concerning the creation and initial implementation of the IEP and the reasons, if any, for adopting the methodology for the purpose of accomplishing the goals that Michael has attained. Instead, she merely monitored Michael's progress, but had no way of determining the source of that progress.

In stark contrast, the parents' expert witnesses provided clear examples of the type of instruction that Michael requires in light of his academic, behavioral, and social deficiencies. The parents' experts, who have a longstanding relationship with and a historical understanding of Michael's needs, testified that Michael continues to require intense one-to-one instruction in order to sustain his progress. The testimony is supported by specific reasons as to why one-to-one instruction is required in Michael's case.

### VII.

For the foregoing reasons, the court finds that the Board has not met its burden of proving that the IEPs were reasonably calculated to provide Michael a free appropriate public education. Accordingly, the court finds that the Board has violated its obligations under the IDEA.

The parents are entitled to the reimbursement ordered by the hearing officer if they can prove that the home-based supplemental Lovaas program was reasonably calculated to provide Michael with a free appropriate public education. The parties shall provide the court a proposed briefing schedule on this remaining issue.

The court **DIRECTS** the Clerk to forward a copy of this Order to counsel of record and all unrepresented parties.