**Leslie PITCHFORD, on behalf of their child, M.; et al., Plaintiffs,**

v.

**SALEM–KEIZER SCHOOL DISTRICT NO. 24J, Defendant.**

**Civil No. 00–629–JO.**

United States District Court,
D. Oregon.

Aug. 20, 2001.

Steven N. Bogdon, Blair, Schaefer, Hutchison & Wolfe, Vancouver, WA, for Plaintiffs.

Mark B. Comstock, Garrett, Hemann, Robertson, Jennings, Comstock & Trethewy, Salem, OR, for Defendant.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

Leslie Pitchford and Andrew Stich ("plaintiffs") bring this action on behalf of their autistic child, M. Plaintiffs claim that defendant, the Salem Keizer School Dis-

trict ("defendant" or the "district"), failed to provide M. with a free and appropriate public education ("FAPE") as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401(a)(18), and corresponding state law. On January 7, 2000, after fourteen (14) days of hearings, Administrative Law Judge Thomas B. Herbert (the "ALJ") issued findings of fact and conclusions of law, in which he held that defendant had provided M. with FAPE.

Plaintiffs now bring this action, challenging the ALJ's opinion and seeking a declaratory judgment that defendant denied M. FAPE. Plaintiffs also request expenses they incurred in providing M. with supplemental educational services, compensatory educational services, fees and costs.

## I. STANDARD OF REVIEW

20 U.S.C. § 1415(i)(2)(B) provides that in "any action brought under this [statute], the court . . . shall receive the records of the administrative proceedings . . . shall hear additional evidence at the request of a party . . . and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." IDEA directs courts to apply a "modified de novo" standard for reviewing state administrative decisions. *Doe v. Bd. of Educ.*, 9 F.3d 455, 458 (6th Cir.1993). Courts must conduct an independent examination of the evidence. *Renner v. Bd. of Educ.*, 185 F.3d 635, 641 (6th Cir.1999) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). The district courts should not, however, "substitute their own notions of sound educational policy for those of the school authorities which they review . . ." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. There is an "implied requirement that due weight

shall be given to these proceedings." *Tucker v. Calloway County Bd.*, 136 F.3d 495, 501 (6th Cir.1998).

The Ninth Circuit has analyzed the weight that is "due" in such cases, concluding that "the courts are to consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue, but the court is free to accept or reject the findings in part or in whole." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (citations and quotation marks omitted). The *Capistrano* court directed district courts to "read the administrative record, consider the new evidence, and make an independent judgment based on a preponderance of evidence and giving due weight to the hearing officer's determinations." 59 F.3d at 892. Greater deference is owed to those administrative findings that are "thorough and careful." *Union Sch. Dist. v. B. Smith*, 15 F.3d 1519, 1524 (9th Cir.1994). Ultimately, the proper level of deference "is a matter for the discretion of the courts." *Gregory K. v. Longview School Dist.* 811 F.2d 1307, 1311 (9th Cir.1987).

## II. FINDINGS OF FACT

Having considered the parties' arguments, the pleadings submitted, and the administrative record, the court enters judgment for defendant based on the following findings of fact and conclusions of law: [1]

### A. *The Nature and Treatment of Autism*

For purposes of eligibility for special education and related services, autism is defined as "... a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age 3, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences." 34 C.F.R. § 300.7(c)(1)(i). According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, ("DSM–IV"), autism is a condition characterized by the presence of markedly abnormal or impaired development in social interaction and communication and a markedly restricted repertoire of activity and interest. The impairment in communication is marked and sustained, and affects both verbal and nonverbal skills. In many cases, there is a delay in, or total lack of, the development of spoken language. Autistic children often engage in repetitive, self-stimulatory behavior, and are preoccupied with light, sound, touch, or other repetitive sensory experiences.

Two of the most widely accepted methodologies for the treatment of autism are the Lovaas method and the Treatment and Education of Autistic and related Communications Handicapped Children ("TEACCH"). The Lovaas method was developed by Dr. Ivar Lovaas in 1987, who conducted a three-year study of 19 autistic children. The children were all age three or under, and all received 40 hours per week of intensive, one-on-one drills in their homes. At the end of the study, most of the children showed marked improvement in communication and social skills.

The Lovaas method relies heavily on Applied Behavioral Analysis ("ABA") and Discrete Trial Training ("DTT"). ABA "consists of breaking down activities into

---

**1.** In some instances, the court has drawn its findings of fact from the proposed findings submitted either by plaintiffs or defendant. Also, where noted, the court has adopted the findings of fact reached by the ALJ in the underlying administrative decision.

discrete individual tasks and rewarding the child's accomplishment. The child eventually learns to integrate the information and associate instruction with a given activity." *Mr. X v. New York St. Educ. Dept.*, 975 F.Supp. 546, 548 (S.D.N.Y.1997). DTT is one aspect of the ABA program. It utilizes "discrete trials," which are intensive drills generally given by a single teacher or staff member to a particular child. The teacher gives the child a prompt, and follows it up with a consequence based on whether the child responds appropriately. When the child responds incorrectly, the teacher devises an intervention plan to stop the behavior. The Lovaas method employs these discrete trials, almost at the exclusion of other methods, with the goal of teaching behavior and language through repetition. This method of teaching is often referred to as "mass trials." A primary aim of the Lovaas method is to foster a child's ability to communicate, especially through the use of spoken language.

In contrast to the rather intensive Lovaas method, the TEACCH program "creates a classroom environment for autistic children which is predictable and therefore understandable." *C.M. v. Bd. of Educ. of Henderson County*, 85 F.Supp.2d 574, 586 (W.D.N.C.1999). "The physical space of their classroom is arranged in a manner that explains to the child what will happen in different parts of the learning program." *Id.* The premise of TEACCH is to utilize the typical strengths of children with autism, including visual learning, visual cues and visual scheduling, to develop other related skills that are generally more challenging. The program emphasizes a variety of communication skills and socialization, all aimed at helping the child "generalize" skills that are fostered in her educational environment. TEACCH also employs behavioral intervention, incidental teaching through various structured activities, and the Picture Exchange Communication System.[2] Because autistic children typically have difficulty with change and uncertainty, a TEACCH program is designed with predictability in mind. *See* Testimony of Bryna Seigel, Tr. Vol. IV, 735: 25.

Dr. Seigel explains that TEACCH is "very well-suited for the child who has limited receptive or expressive language, because they can figure out what's going on from visual cues." Tr. Vol. IV, 736: 1–3. She goes on to contrast Lovaas and TEACCH methods in a typical classroom:

> The main difference [between TEACCH and Lovaas] is that TEACCH provides more self-initiative for kids. It depends more on the environment to structure the order of actions than adult-initiated teaching. So instead of the adult saying "Okay, now, touch green," or "touch nose" or "touch car," or "put with," whatever the task is, the child has a basket of work that has colors in it, and they have to put green with green and blue with blue. They are doing the same content tasks often, but the child has to do it under their own steam.

Tr. Vol. IV, 736: 11–20. Thus, TEACCH creates an environment conducive to learning, with the idea that autistic children will be motivated to develop more independent learning skills in a safe and predictable environment, and will be more able to generalize the skills they learn to other facets of their lives.

**B. *M.'s Early Diagnosis and Education***

M. was born on October 16, 1989. In November of 1990, when M. was just over one year old, plaintiffs became concerned that M. was not developing normal speech and language skills. An initial evaluation

---

**2.** The Picture Exchange Communication System utilizes drawings of objects that children can "exchange" for the actual object depicted in the picture.

conducted by the Mid Valley Children's Guild concluded that M., who was fifteen months old at the time, functioned at the age of eight to ten months in the areas of speech and language. The report noted that M. displayed only limited eye contact and did not appear to distinguish her mother from strangers. The report recommended referring M. to the Mid Oregon Regional Program ("MORP") to further evaluate her social and communication skills and to rule out autism.

On January 15, 1991, M.'s parents contacted MORP to request a thorough evaluation of M. On May 16 and 17, 1991, MORP diagnosed M. with autism and concluded that she was eligible to receive early intervention services. In its Initial Eligibility Report, MORP reported that M. had developed some fundamental skills, including gesturing, responding to requests and vocalizing "dadada," and recommended several methods for further developing M.'s speech and language skills. Exhibit ("Ex.") 23. An Individual Program Plan ("IPP") was finalized on May 16, 1991, and concluded that M.'s program should be aimed at developing expressive and receptive communication, improved eye contact and other related skills. Ex. 20.

On May 18, 1992, a second IPP was developed. Ex. 26. M.'s parents met with the MORP parent advisor, and after reviewing M.'s progress, the parties found that she had made significant strides in communication. She was using some gestures effectively, speaking 10–15 words, and in some cases using photos to make requests and choices. The IPP provided that M. would participate in a weekly toddler group one time per week and that MORP would consult with M.'s child care provider three hours per month. The plan also set specific goals and objectives for M., including expansion of her working vocabulary to 40 words, expansion of her receptive language skills, and socially appropriate participation in group activities.

At the age of three, M. was deemed eligible for Early Childhood Education Services under the category of autism. Ex. 36. On August 31, 1992, M.'s parents met with MORP staff to develop a family education plan, called an Individual Family Service Plan ("IFSP"). The IFSP that was developed provided for Mentally Retarded/Developmentally Disabled (MR/DD) case management, attendance at an MR/DD preschool, transportation and weekly MORP consultation. Similar to the previous plan, the IFSP included objectives related to eye contact, receptive and expressive language and socially appropriate behavior.

On May 26, 1993, the IFSP team adopted an IFSP for the following year. Ex. 38. The 1993 IFSP reiterated many of the goals of the first IFSP, but modified those goals where M.'s progress had apparently cast doubt on her ability to meet the goals of the prior plan. For instance, the 1992 IFSP had set a goal for M. to use 40 spoken words by the end of the year; after seeing her progress during that time, the team modified that goal, aiming instead for 25 spoken words during the second IFSP period.

In June of 1993, MORP issued its year-end transition report, which contained a review of M.'s progress. Ex. 39. At that time, MORP recommended a speech and language evaluation to aid in the development of an appropriate education strategy. The suggested evaluation was completed on January 3, 1994, by Debra Barnard, a speech and language pathologist. Ex. 42. The evaluation reviewed incidents witnessed by Ms. Barnard during her three observations and summarized a report of M.'s progress provided by her mother. In her summary, Ms. Barnard stated that M. was "functioning significantly below age

level both receptively and expressively." Ex. 42, p. 2.

By the time MORP issued its year-end report, plaintiffs had become dissatisfied with M.'s progress under MORP. They decided to enroll M. in StepUp, a private educational program that employed a TEACCH-based curriculum. StepUp evaluated M. and devised an Individualized Program Plan ("IPP") for the 1994–95 school year. Ex. 49. The IPP recommended education strategies that emphasized M.'s safety, self awareness, and communication skills. At StepUp, her program did not emphasize the use of particular spoken words, but instead identified more general communication goals of increasing receptive and expressive communication "in a variety of forms." Ex. 49, p. 3.

The StepUp program announced that it would be closing at the end of the 1994–95 school year. At that time, M. could respond to a few commands in context, but she did not process or understand typical verbal conversation directed toward her, and she did not engage in sharing or imaginative play. She also lacked basic concepts, such as cause and effect. Finally, while she had gained some basic skills with visual cues, she had lost the use of virtually all spoken language. It was then that M.'s parents began the process of enrolling her in the Salem Keizer School District.

### C. *M.'s Education at the Salem–Keizer School District*

#### 1. *Initial Eligibility Determination*

In May of 1995, the district conducted an initial eligibility review to determine whether M. was entitled to special education services. The team of evaluators consisted of six parties:

1) Betty Alexander, a kindergarten teacher;

2) Constance Richards, a speech and language pathologist;

3) Seanna Hennessy, a special education teacher in the Learning Resource Center at Four Corners, the elementary school M. would be attending;

4) Julie Bryant, an early intervention coordinator for the District; ʼ

5) David Guile, the school principal;

6) Rich Frederick, a school psychologist. Ex. 62. On May 5, 1995, the team concluded that M. was eligible to receive special education services under the categories of autism and speech and language impairments. Exhibits 60–62. The team recommended that M. be given a communication assessment in preparation for her kindergarten year. That assessment was apparently not performed.

In reaching its conclusions, the team indicated that it relied on three categories of documents: 1) a physician evaluation performed by Dr. Stubbs on March 2, 1994; 2) a Mid Oregon Regional Services ("MORS") speech and language evaluation conducted on January 3, 1994; and 3) three observation reports and a MORP report. In Dr. Stubbs' report, he evaluated M.'s physical activity, eye contact and interaction with her family. He noted that she had problems with safety issues and potty training, as well as a very short attention span. Finally, he observed that she had lost the use of any meaningful verbal communication, and confirmed that she was autistic. Ex. 48.

The MORS speech and language evaluation was prepared by Debra Barnard, a speech and language pathologist, on January 3, 1994. Ms. Barnard reviewed M.'s diagnostic history and a parent questionnaire, and observed M. in class on two separate occasions. She concluded that M. was functioning significantly below age level, and she recommended that a multidisciplinary team meet to review the evaluation results and discuss eligibility for services. Ex. 42.

Finally, the three observation reports and the MORP report relied upon by the team appear to refer to a Kindergarten Readiness Test that was administered by defendant. Ex. 59. The only information contained in the report relating to M. is a single page of handwritten notes, apparently referring to M.'s behavior while the teacher attempted to administer the test. The notes indicate that M. was having some difficulty following directions, perhaps while attempting to take the test. Also noted are M.'s attempts to match colored eggs, climb on a "big toy," and scribbling and coloring with markers. In addition to these documents specifically listed in the Statement of Eligibility form, the team had M.'s entire file available for its review. These documents included numerous documents covering M.'s condition and development over a period of approximately eighteen months.[3] *See* Tr. Vol. V., 918: 7–25; 919:1–3. Based on the information contained in the sources reviewed here, the team concluded that M. was eligible for special education services under the categories of autism and speech and language impairments.

### 2. *M.'s Kindergarten Year*

On June 8, 1995, after M.'s eligibility was established, the district met to develop her Individualized Education Plan ("IEP") for the 1995–96 school year. The following parties were present at the meeting: 1) Constance Richards, an IEP manager; 2) Seanna Hennessy, a representative from the district; 3) plaintiffs; 4) Julie A. Bryant, a district coordinator; and 5) An-

nette Skowron–Gooch, an expert on autism. Ex. 69. Aside from the parents, Ms. Annette Skowron Gooch from MORP was the only participant who had previous experience with M. M.'s eventual teacher, Steve Harland, was not present.

At the June 8, 1995 IEP meeting, the group reviewed available documents to determine M.'s skill level as well as corresponding objectives to develop those skills. At the trial before the ALJ, Ms. Skowron–Gooch stated that "file reviews" are often performed at the time of an initial review in lieu of a personal observation of the child. She explained that at the time M. began attending the school, "[t]here would be a file review, which would look at what information is available, what has occurred in terms of prior evaluations and developmentally for [M.]. . . ." *See* Tr. Vol. V., 916:17–20. She went on to characterize a file review as evaluative in nature:

> [The file] represents the developmental history of any one child. . . . [It would] give background in terms of what skills were taught and lost, what skills were learned more easily or less easily. It would give background in terms of what her future needs would be. . . . She was coming out of one program into another, so it would be a way to look at continuing for her what she was doing.

*See* Tr. Vol. V., 917:17–24. Finally, Ms. Skowron Gooch stated that the team had sufficient information to conduct its review, based on the unique aspects of M.'s condition, the length of time during which the available information was gathered,

---

**3.** Defendant lists the specific additional documents on which the team relied: 1) Exhibit 43: A parent evaluation of M. by Leslie Pitchford; 2) Exhibit 45: An evaluation and individual plan from StepUp, dated January of 1994; 3) Exhibit 47: An Occupational Therapy evaluation done for StepUp in February of 1994; 4) Exhibit 49: A Treatment Plan prepared for StepUp that included present levels

of performance; 5) Exhibit 50: An Oregon Hope and Health Center Evaluation; 6) Exhibit 51: A physical therapist evaluation from October of 1994; 7) Exhibit 52: Progress summary prepared for StepUp by Dr. Stubbs and Angela Miller; 8) Exhibit 53: Oregon Hope and Health Re Evaluation from December of 1994.

and the numerous services that M. had received. Ms. Skowron–Gooch explained:

> [M.] had been involved in service over a number of years, and so there was pattern and history with it, and ... it was [with] multiple service providers. We had the Early Intervention program involved in the autism program ... but she also went to OHSU for evaluations, and, of course, the ongoing work that was done at Step–Up. So over her preschool years, quite a bit occurred.... [The information was not outdated] because developmentally she was-she was very much a beginning learner in many ways. She was still at a prelanguage level. She was still learning the basics of just understanding intent of communication. She was learning beginning play skills.... [D]evelopmentally, her progress was not so fast that it ... would be outdated.

Tr. Vol. V. 918–919. Ms. Skowron Gooch thus confirmed that the team had substantial information regarding M.'s history and development, and that the information available provided a reliable pattern of behavior on which to base conclusions regarding eligibility and development of an education plan. The team identified the following objectives for M.'s kindergarten year:

> *Communication:* M. will correctly follow visual transitioning cues within the classroom and to other areas of the school 5 times per day, to include restroom breaks and classroom activities.

> *Readiness:* M. will continue to develop age appropriate skills, to include matching letters of the alphabet,

matching numbers 1–20, and identifying her own name in a group of names Ex. 69 p. 6–7.

M.'s program was to be implemented at the Development Learning Center ("DLC") at Four Corners Elementary School ("Four Corners"). At the time, the DLC had a modified calendar school that was in session from early September through mid-July. The school year consisted of one six-week break in the summer, and two three week breaks at Christmas and Spring Break, for a total of twelve weeks of break time throughout the year.

In the fall of 1995, M. was placed in a kindergarten class with approximately ten developmentally disabled children, of which she was one of the more severely impaired. Her primary teacher was Stephen Harland. Forty-five minutes of M.'s day were allocated to "readiness" services, and approximately 20% of her time was designated as "regular education."[4] In addition, she was to receive approximately 35 minutes of consultation services by an occupational therapist and a speech and language expert. Finally, ten hours per year were allocated for MORS–Autism consultation.

Mr. Harland utilized an education program with M. that combined numerous methods of teaching M., but relied most heavily on the TEACCH method. *See* Testimony of Dr. Seigel, Tr. Vol. IV, 759. Typically, Mr. Harland taught M. symbols and icons that would allow her to communicate with others. During snack time, Mr. Harland also used drills and picture cues to encourage correct communication responses from M. M.'s class schedule also included physical education, circle time,

---

**4.** Regular Education services included singing, break and regular class activities. *See* Ex. 69 and ALJ decision ¶ 9.

during which a staff member might read or sing with the children, and work systems targeting specific needs of each individual child. Dr. Seigel, a professor in child development and education at the University of California at San Francisco, explained the virtues of this type of TEACCH-based system for a child like M.:

> [TEACCH] is very well-suited for the child who has limited receptive or expressive language, because they can figure out what's going on from visual cues. Most autistic children have performance IQ's well in excess of their verbal IQ's, so it's very suited to use behavioral methods around the symptom profile of kids with autism.

Tr. Vol. IV, p 736:1–7.

While all of M.'s specific educational objectives were not met during her kindergarten year, M did experience some progress. The ALJ made the following findings with respect to M.'s progress during her kindergarten year, with which I concur:

> *Communication:* 1) M. has not met the objective of visually transitioning to and from the bathroom without wandering, and still requires frequent cues. She tends to be distracted and confused at transition times; 2) M. has not fully met the objective of consistently transitioning within the classroom using visual cues, and can do so only for preferred activities, such as snack and recess.
>
> *Readiness:* 1) M. met her first objective of matching 100% of letters, but she does not find them; 2) M made no significant change on objective 2, which stated that M. would match the numbers 1–20 with 85% accuracy; she could match the numbers, but could not count; 3) M. did not meet objective 3, which sought. to train M. to identify her name in a group of names.

### 3. *M.'s First Grade Year*

On May 9, 1996, a team met to develop M.'s IEP for the 1996–97 school year. Attending the meeting were 1) Stephen Harland, M.'s teacher and the IEP manager, 2) Charles McFerron, the MORS autism specialist, and 3) M.'s parents. Ex. 76. The district representative did not attend, but did sign onto the IEP after the fact, approving the level of services and the commitment of district resources to M.'s program. The IEP included a discussion of M.'s progress during her kindergarten year, and implemented updated goals on those bases. *See* Ex. 76, pp. 2–8. Specifically, the 1996–97 IEP developed a plan that included:

*Specially designed services in:*

- Reading for 30 minutes per day in the DLC commencing September 6, 1996;
- Math for 30 minutes per day commencing September 6, 1996 for one year by the DLC;
- Written language for 30 minutes per day commencing September 6, 1996 for one year provided by the DLC.

*Related services included:*

- Daily transportation;
- Physical therapy five minutes per week on a consultative basis;
- Speech and language services on a consultative basis ten minutes per week;
- Autism Specialist consultation eight hours per year.

The IEP also provided that M. would spend 30% of her school day in regular education, to include recess, lunch, classroom activities and physical education.

Similar to the 1995–96 IEP, the 1996–97 IEP included a number of specific goals:

*Communication goals*

- Expressive Communication goal: When presented with visual transition cues, as in a schedule, and activity, or the end of an activity, M will use the cue to anticipate the next activity and easily transition to the next activity 90% of the time as shown by teacher probes.
- Second Communication goal: When M desires an object or activity, she will use a visual cue, such as a Meyer Johnson drawing, a picture, or written words/visual cue to indicate what it is that she wants at least 5 times per day in at least 2 different settings as shown by teacher probes.

*Safety goals*

- When in the classroom and school environment, M will use visual cues and boundaries and place in order to remain safe as shown by teacher probes.
- When frustrated or confused, M will use visual cues, gestures or objects to indicate her frustration, rather than crying, banging and biting at least once per day as shown by teacher probes.

Ex. 76.

On the 1996 IEP form, the box for extended school year services ("ESY") was not checked, indicating that the issue of ESY services was not raised at the May 9, 1996 IEP meeting.[5] In his findings of fact, the ALJ noted this fact. He concluded, however, that the issue was raised. The ALJ explained that he believed Mr. Harland, who claimed to have raised the issue of ESY services at the 1996–97 IEP meeting. In reaching this conclusion, however, the ALJ did not address substantial conflicting evidence. First, both parents testified that they were not informed of the

option of ESY services until the middle of M.'s second grade year. Second, meeting minutes taken from a meeting held on June 22, 1998, indicate that the issue of ESY services had not been raised before. Linda Bonnem, a coordinator attending the meeting, stated that M. had never been "under consideration" for such services before. At the same meeting, the parents stated that they had not been informed such services were available. Significantly, Mr. Harland, who was present for the entire meeting, never stated that he raised the issue in prior IEP meetings.

With due respect to the ALJ's finding, I conclude that there was sufficient evidence not addressed in his opinion to cast doubt on his conclusion. In light of the ALJ's credibility determination, however, I cannot definitively reach the contrary conclusion based solely on the evidence before me. I will therefore hold a trial on the sole issue of whether the issue of ESY services were raised at the IEP meetings for M.'s 1996–97 and 1997–98 school years.

In September of 1996, M. was placed in a first grade class with a total of twelve developmentally disabled children and six staff members. Steve Harland, M.'s teacher, implemented the 1996–97 IEP by utilizing a visual schedule, positive direct re-enforcers and a variety of work systems. Again, Mr. Harland's curriculum was based primarily on the TEACCH methodology, and used Myer Johnson icons and pictures for visual cues. Mr. Harland also used some verbal cues, as to verbalize the objects represented in visual cues.

In May of 1997, M.'s progress for the 1996–97 school year was evaluated. While she did not meet all the goals that had been established for her, she did make some progress. Specifically, M. improved

---

**5.** Extended school year services generally provide additional educational services dur-

ing break periods.

in the areas of transitioning between activities, effectively using visual cues and performing academic tasks independently. I have carefully reviewed the facts and evidence submitted on this issue, and consider the ALJ's findings regarding M.'s progress during her first grade year to be both thorough and accurate. Therefore, I adopt Finding of Fact number 16 in full.[6]

4. *M.'s Second Grade Year*

A third IEP team convened on June 3, 1997, to develop the IEP for M.'s 1997–98 school year. Present at the meeting were 1) plaintiff Leslie Pitchford, M.'s mother, 2) Stephen Harland, M.'s teacher, 3) Gerrie Harrison, a student and caretaker hired by plaintiffs, and 4) Joy Kalita, a student teacher. Ex. 84. Also signing the IEP form was Mr. Schrecengost, the District representative. While the evidence indicates that he did not attend the meeting, he did sign the form, authorizing the allocation of resources necessary for the services provided to M. in the 1997–98 IEP.

The 1997–98 IEP provided:

Specially Designed Services

- Reading: 1 hour per day
- Math: 1 hour per day
- Written Language: 1 hour per day
- Physical Education: 2 hours per week

Related Services

- Transportation: daily
- Occupational Therapy: 14 hours per year
- Physical Therapy: 14 hours per year
- Speech/Language Therapy: 30 hours per week
- MORP Autism consultation: 10 hours per year

Regular Education

- Class activities, recess, lunch, etc.: 30% of the time

The IEP contained similar goals to those contained in the previous year, but were updated to take into account M.'s progress during her first grade year. The IEP included nine pages of specific goals for M.'s second grade year, including an expressive communication goal, a receptive communication goal, an inclusion goal, a motor skills goal, a safety goal, a social skills goal, and two academic goals related to work systems exercises.

Having carefully reviewed the findings of the ALJ with respect to M.'s progress during her second grade year, I again conclude that they are correct. I there-

6. In adopting the ALJ's findings on this point, I also note that while plaintiffs dispute that the progress M. experienced was meaningful, the ALJ's findings on the particular advances made by M. were not seriously disputed.

fore adopt in full the ALJ's finding of fact number 19.

5. *Third and Fourth Grade*

All parties agree that M.'s education plan changed dramatically at the close of her second grade year. Two significant events occurred at that time that precipitated the change. First, defendant conducted a three-year re-evaluation at the end of M.'s second grade year.[7] The evaluation team included 1) Roxanne Warren, a speech and language pathologist, 2) Steve Harland, M.'s teacher, kindergarten through second grade, 3) Beverly Kropp, a program assistant, 4) Lynda McCarthy, a coordinator, 5) Lowell Smith, the school psychologist, 6) Annette Skowron–Gooch, the MORS autism specialist, and 7) plaintiff Leslie Pitchford, M.'s mother. Ex. 113.

In updating M.'s program, the team relied on two examinations of M. that were conducted in early June of 1998. First, Dr. Lowell Smith administered a Stanford–Binet Intelligence Scale to M, resulting in a composite score of 36.[8] The test indicated that M. was non-verbal, but was strong in the area of abstract visual cues. Second, Ms. Warren provided a language and communication assessment to an aide in M.'s classroom, requesting that she describe M's use of language and communication. Ex. 104. Ms. Warren followed up with observations of M. in three separate settings. Ex. 105. She then prepared an autism eligibility communication report for

the IEP team based on her observations and the information collected during the evaluations. Ex. 106. In the report, Ms. Warren stated that M. was a non-verbal child who was attempting to utilize pictures and some signing to communicate with those around her, but noted that M. was not yet fully functional with these communication aids. Ms. Warren recommended increased emphasis on communication skills, with consistent rewards offered to M. for correct responses, similar to discrete trials. She also suggested "communication temptations" that forced M. to respond to problems with effective communication methods.[9] In her summary, she cautioned that "[b]eginning slowly would defend against stress, confusion and skill regression." Ex. 106, p. 4. Based on Ms. Warren's report, defendant added eligibility for services on the basis of mental retardation, and dropped M.'s eligibility under the category of speech and language impaired, as it was subsumed by the category of autism.

A second significant event that occurred at that time was that plaintiffs discovered the Lovaas method of teaching autistic children, and took steps to implement this approach in M.'s school program. Toward that end, plaintiffs sought training from Project PACE in Portland. Project Pace developed goals and objectives for M., trained individuals hired by plaintiffs to provide direct instruction in the form of discrete trials, and assigned drills to address M.'s needs. Plaintiffs also hired an

7. 34 C.F.R. § 300.536 provides that a reevaluation be "conducted every three years, or more frequently if conditions warrant, or if the child's parent or teacher requests an evaluation."

8. The Stanford Binet Intelligence scale is a test that measures the "global level of intellectual functioning, especially at the middle to lower end of the intelligence range." *See Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir.1990).

9. For instance, Ms. Warren suggested "[c]reating communication temptations such as locked or difficult to open containers with desired objects and then requiring [M.] to respond to the problems.... Pictures and or signs can be imposed upon these communicative temptation situations to require a unique and different response from [M.]." Ex. 106, p. 4.

employee, Gerrie Harrison, to be trained on these methods of teaching.

In the spring of 1998, prior to the IEP team meeting to develop M.'s 1998–99 IEP, plaintiffs requested that Mr. Harland and defendant consider this Lovaas-based approach for M.'s third grade education program. They requested a significant change in her schedule, to include intensive, one-to-one, discrete trials in a 40 hour per week program that included weekly meetings for family and training staff. Plaintiffs also asked that the school program be supervised by individuals who had obtained a Ph.D. in a field related to early childhood education and/or autism. They proposed that the program be supervised by Project Pace and Dr. Katherine Calouri, a clinical psychologist at UCLA, and that it include ongoing collection and analysis of data. Additionally, plaintiffs requested a full-time summer program.

On June 4, 1998, plaintiffs asked that a school district employee attend a workshop plaintiffs had set up with PACE, so that a school employee could utilize methods from the PACE plan that had been developed. One district employee did attend the workshop. Plaintiffs also requested, on June 15, 1998, that M. immediately be placed in a full-time home based program for the 14 remaining days of her second grade year, asking the school to fund the summer program during that period. The district denied that request.

a. M.'s Third Grade Year

The IEP team for the 1998–99 school year met on June 22, 1998. Present at the meeting were 1) Steve Harland, M.'s teacher; 2) Lynda McCarthy, a special education coordinator; 3) Lynda Bonnem, a special education coordinator; 4) Chuck McFerron, an autism specialist from MORS; 5) Beverly Kropp, a program assistant; 6) Roxanne L. Warren, an autism specialist, and 7) plaintiffs. At that time, the team adopted M.'s third grade IEP, which included: [10]

Specially Designed Services

| | |
|---|---|
| • Motor/Sensory | 30 minutes 4 times weekly |
| • Scheduling/Transitioning | 30 minutes per day |
| • Speech/Language | 1 hour per day |
| • Communication/Imitation | 1.5 hours per day |
| • Social Skills | 1 hour per day |

Related Services

| | |
|---|---|
| • Transportation | 2 times per day |
| • Physical Therapy | 14 hours per year |
| • Occupational Therapy | 14 hours per year |
| • Speech/Language | 30 minutes per week |

10. In September of 1998, M. drank an unidentified liquid while at school and was taken to the emergency room. Following that incident, M.'s third grade IEP was modified to ensure that M. would receive one-on-one supervision for the entire school day, in order to address the issue of safety.

| | |
|---|---|
| ● MORS Autism Consultation | 10 hours per year |
| ● Physical Education | adaptive |
| <u>Regular Education</u> | 30% of the time |

Beginning in the third grade, M. was to attend Morningside Elementary. Pursuant to plaintiffs' requests, her third grade IEP placed greater emphasis on discrete trial training, including higher structuring and more one-on-one drills throughout much of the day. The 1:1 ABA instruction totaled 25.5. hours, of which 12.5 hours used discrete trials. This was substantially less than the schedule of five hours per day of intensive drills that plaintiffs had requested.

The district relied on various experts to provide further support with M.'s program at Morningside. First, the district entered into a contract with Dr. Joel Arick, which provided that he would train and consult with district employees to further develop M.'s program at Morningside. In this capacity, Dr. Arick trained staff regarding treatment methods, and consulted with district staff on four occasions during M.'s third grade school year. In addition, M. received direct Speech/Language services from Pat Dixon, a speech and language pathologist. Ms. Dixon used behavioral methods with M. and reported gains in the areas of receptive and expressive language development in connection with the services she provided. It is clear that M.

benefitted significantly from the intervention of these experts.

The IEP team also addressed the issue of ESY services at the June 22, 1998 meeting. The team analyzed probe data collected during the 1997–98 school year, and concluded that the data failed to demonstrate significant regression or lack of recoupment. Ex. 120. On that basis, the team concluded that M. was not entitled to ESY services at that time.

While the parties dispute both the adequacy and the success of M.'s 1998–99 IEP, there is no question that M. made progress under this modified program. Having carefully reviewed the ALJ's findings with respect to M.'s progress during her third grade year, I concur with them in full. Therefore, I adopt the ALJ's finding of fact number 21.

b. M.'s Fourth Grade Year

On June 2, 1999, the IEP team met to develop an IEP for the 1999–2000 school year. Ex. 200. Present at the meeting were 1) plaintiff Leslie Pitchford, M.'s mother, 2) Shelley Kennen, a special education staff member, 3) Lynda McCarthy, a special education coordinator, 4) Pat Dixon, a speech and language pathologist, 5) Roxanne Warren, an autism specialist and speech and language pathologist, and 6) Karen Jordan, a MORS autism specialist. The June 2, 1999 IEP provided:

<u>Specially Designed Instruction</u>

| | |
|---|---|
| ● Reading | 30 minutes per day |
| ● Math | 15 minutes per day |
| ● Written Language | 30 minutes per day |
| ● Physical Education | 30 minutes per day, three times per week |

- Safety 30 minutes per day

- Speech/Language 75 minutes per day

- Daily Living 30 minutes per day

- Social Interaction 15 minutes per day

- Self Help Eating 20 minutes per day

Related Services

- Transportation To and from school five school days/week

- Occupational Therapy six hours per year

- Speech/Language One hour per week

- MORS Autism Consultation Ten hours per year

Regular Education

- Lunch and Mainstream Activities 30% of the time

In preparation for the IEP meeting, a District team convened in May of 1999 and determined that ESY services were warranted for the summer of 1999.[11] Ex. 196. The team did not find evidence of significant regression, but did identify a "predictive factor" that increased the likelihood of M.'s regression. It explained, somewhat inexplicably, that the "home program closely aligns with [the] school program [and] IEP goals and objectives." Ex. 196, p. 3. Apparently, the team felt that given the parallel methods and goals of the two programs, her education would be enhanced by the continuation of services through the summer. In any case, the team held that M. was entitled to ESY services for the summer of 1999.

The ESY program proposed by the District included four days per week, from 8:30 a.m. to 11:30 a.m. for a five-week period. The ESY program took place at the Whiteaker Middle School and included the following objectives:

- Imitate single sounds
- Imitate CV or VC words/sounds
- Imitate CVC words
- Sort into categories
- Copy six shapes, letters and names, vocabulary words
- Receptive noun drill: stencils, pencil, backpack, marbles, crackers and peanut butter
- Follow one step directions: pick up, sit down, stand up, get (an object), raise hand, come here and stop.

On June 17, 1999, at the request of M.'s parents, the ESY services were increased one hour per week, to include two half-hour sessions that specifically addressed receptive vocabulary skills.

At the close of M.'s fourth grade year, plaintiffs requested a due process hearing with the goal of enhancing M.'s educational

---

**11.** The team included Shelly Kennon, M.'s teacher, Karen Jordan, a MORS autism specialist, Roxanne Warren, a speech and language pathologist, Lynda McCarthy, a special education coordinator, and M.'s mother.

program at Morningside. The main additions requested were:

- 40 hours of individual direct instruction per week, provided year-round
- Supervision of M.'s program by Dr. Joel Arick or Dr. Katherine Calouri
- Staff training in discrete trial methods and effective supervision
- Reassessment of program goals every two weeks
- Two hours per day of mainstreaming
- 1:1 supervision at all times
- Family education would be provided and program costs paid by the district
- Future hiring of instructional assistants would favor individuals who had worked with M. in the past

In addition to these requests for a modified program, plaintiffs also requested reimbursement for expenses they incurred in providing summer programs for 1996 and 1997, and for a home program provided during the Spring of 1998.

## III. DISCUSSION

### A. *Statute of Limitations*

Plaintiffs initiated the administrative action on July 15, 1996. At the administrative proceeding, defendant argued that any of plaintiffs' claims seeking relief for events prior to July 14, 1996, were barred by the applicable two-year statute of limitations, O.R.S. § 12.110(1) and O.R.S. § 30.275(8). The ALJ agreed. Therefore, because plaintiffs filed this action on July 14, 1998, the ALJ held that all claims for relief arising out of events that occurred prior to July 14, 1996 were barred. Since that time, the Ninth Circuit handed down its opinion in *S.V. v. Sherwood Sch. Dist.*, 254 F.3d 877, 2001 WL 709254 (9th Cir. 2001). There, the court held that a suit for tuition reimbursement under IDEA is governed by the two-year Oregon Tort Claims Act statute of limitations.

Based on my review of *Sherwood* in relation to the facts of this case, it would appear that any claims for relief for events occurring prior to July 14, 1996 would be barred. The ALJ, however, reached this conclusion, and yet made findings of fact and conclusions of law with respect to M.'s kindergarten year, which occurred prior to July 14, 1996, and therefore would presumably be barred. Because the parties have not had the opportunity to address the applicability of *Sherwood* to the facts of this particular case, and there appears to be some confusion as to whether M.'s kindergarten year is within the reach of the limitations period, I invite supplemental briefing on the issue of the statute of limitations alone. If the court concludes, after reviewing the parties' submissions, that M.'s kindergarten year is within the limitations period, I will issue an order to that effect, along with findings of fact and conclusions of law relating to the adequacy of M.'s kindergarten program. Briefing of this issue will be deferred, pending the outcome of mediation.

### B. *Adequacy of M.'s program at the District*

IDEA provides state and local educational agencies with federal funding for the education of handicapped and disabled children. To qualify for this funding, a state must have in place a policy to ensure that all disabled children have a right to a "free appropriate public education," or "FAPE." 20 U.S.C.A. § 1412. FAPE consists of "special education and related services" that (1) have been provided at public expense and under public supervision and direction; (2) meet the standards of the state's educational agency; (3) include an appropriate preschool, elementary, or secondary school education in the state; and (4) are provided in conformity with the individualized education program required under IDEA. 20 U.S.C.A. § 1401(8).

■ The Supreme Court has held that the "basic floor of opportunity provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201, 102 S.Ct. 3034 (citations omitted). Thus, a state need not provide services "sufficient to maximize each child's potential." *Rowley*, 458 U.S. at 198, 102 S.Ct. 3034.

In *Rowley*, the U.S. Supreme Court laid out a two-step process lower courts must use to determine whether school districts have complied with the Individuals with Disabilities Education Act. First, courts must determine whether the school district has followed the statutory procedures set forth in the Act. Next, courts must address whether the IEP developed through those procedures is reasonably calculated to enable the child to receive educational benefits. If those two requirements are met, the school district has complied with its obligations under the Act. *Id.*

### 1. TEACCH v. Lovaas

■ Mr. Harland, M.'s teacher, utilized a TEACCH-based program in M.'s classroom. Tr. Vol. XI, 2140–42. In his classroom, Mr. Harland typically had at least three assistants. Tr. Vol. I, 67: 8–16. Outside the classroom, he was assisted by MORS, which observed his classroom and gave him teaching recommendations. Having been thoroughly trained in the TEACCH program, Mr. Harland's classroom was highly structured, with routine and predictable activities scheduled throughout the day. To facilitate transitions between activities, a particular difficulty for many autistic children, Mr. Harland utilized pictures, timers, signs and other visual cues. Finally, the particular visual cues were generally accompanied by a verbal component. Mr. Harland explained that he used similar techniques to those utilized in discrete trials, but they

were "embedded" in the classroom environment, rather than taking the form of direct, intensive drills. "[M.] gets many trials of this during the day, but we are not sitting down and presenting behavior, presenting response, presenting response. We are doing it in the environment, so that it's more meaningful to her." Tr. Vol. I, 82: 7–11.

Plaintiffs argue that defendant's use of this system, rather than a system based on direct, intensive drills like those used in the Lovaas method, resulted in a denial of FAPE for M. They claim that instruction centered around ABA principles and discrete trials is uniformly considered the most effective method of teaching autistic children, and the district's failure to implement such a program, primarily between M.'s kindergarten and second grade years, resulted in M.'s significantly diminished educational benefit, and a corresponding denial of FAPE.

I disagree. At the outset, it is worth noting that the Lovaas methodology, while supported by many, also has its detractors. The Lovaas study was performed in 1987 on 19 high functioning children, all age three or four. There is reason to believe that a Lovaas-based approach would not be ideal for a child like M., who was not high functioning and was nearly six years old when she began at Four Corners. Dr. Seigel explains, for example, that by preselecting high functioning children, the study was "skewing the sample to be higher, more promising language-capable children." Tr. Vol. IV, p. 722: 9–11; 13–14. Dr. Mulick, a supporter of the Lovaas methodology and an expert witness for plaintiffs, admits that the Lovaas method is not as effective for a child of M.'s age and ability level. *See* Tr. Vol. III, p. 675: 2–24. Thus, while Lovaas admittedly benefits some children, its general applicabili-

ty to the broad range of autistic children is not clear.

Moreover, defendant did in fact use methods of direct teaching in M.'s classroom. While this direct teaching was not typically done in the form of mass trials, Mr. Harland regularly used drills at particular times throughout the day. Mr. McFerron's testimony confirms this:

Q: During the time that you observed in Mr. Harland's classroom, did you observe discrete trial training going on?

A: I observed the sequence of offering a cue and waiting for a response, which is what discrete trial is. I wouldn't say I observed it, you know, in mass trial, but, yes, I did observe it. It was one of the things that Steve [Harland] used.

The most significant problem with plaintiffs' argument is that it fundamentally misconstrues the district's burden in providing an education to M. In *Rowley*, the Supreme Court explained that IDEA does not invite courts "to substitute their own notions of sound educational policy for those of the school authorities which they review." 458 U.S. at 206, 102 S.Ct. 3034. Courts must limit their inquiry to a review of the underlying decision for procedural compliance with the statute, and for whether the program is "reasonably calculated" to enable the child to receive educational benefits. *Id.* The issue, therefore, is *not* whether other methods may have existed that were more effective than that chose by the district, but whether the method chosen by the district was *itself* reasonably calculated to afford educational benefit. That being the precise question before me, I conclude that the district's TEACCH-based method of instruction was indeed reasonably calculated to afford educational benefit.

When M. began her education at Four Corners, she had no ability to use verbal communication.[12] M.'s program allowed her to develop important functional, social and transitional skills without requiring the use of verbal communication. Dr. Seigel, one of the District's experts on autism, described specific benefits that a child like M. would likely receive from a TEACCH based program:

[TEACCH] ... can be very adaptive for the individual who doesn't have language, because they can understand what's happening, they can know what to do next, they can make choices using a symbol system and by adhering to the routine. Routine is strongly preferred by many individuals with autism, sometimes because of an obsessive rigidity, but also because of lack of language, and if you don't understand spoken language, knowing what is going to happen is pretty comforting. And so that kind of teaching milieu is very much appropriate.

Tr. Vol. IV, p. 753: 24–25; p. 754: 1–12.

Dr. Seigel's opinion is shared by Ms. Skowron–Gooch, who helped develop M.'s initial IEP. She explains:

I think the focus [at the time the 1995–1996 IEP was developed] would be to communicate intent and messages, to communicate using gestures, using pictures, but for it to have to be verbal, no, because [M.] needed a way to get and give messages and to focus on verbal, because [with] ... all the other things going on for her, [a program emphasizing verbal communication] could have led to more frustration.

Tr. Vol. V., 928: 11–20. There is thus substantial evidence to support defendant's

12. At the age of three, M. could use approximately ten to fifteen words, but she had lost

her verbal skills by the time she was five years old, well before she entered Four Corners.

**1232**

decision to employ a TEACCH-based curriculum for M.

■ While the court may agree that a Lovaas-based program would have been more beneficial for a child like M., it is not the court's role to make such a determination. The determination of the appropriate methodology to be used in teaching a child with special needs, like M., is left to the schools and the experts they employ. *See Rowley,* 458 U.S. at 208, 102 S.Ct. 3034 (noting that "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy") (citations omitted). Only if the court finds that the school has failed to provide a "basic floor of opportunity" and "access to specialized instruction and related services which are individually designed to provide educational benefits to the handicapped child," can it conclude that the school has denied the child FAPE. *Rowley,* 458 U.S. at 201, 102 S.Ct. 3034. The school's use of a TEACCH-based curriculum does not warrant such a finding.

### 2. *Adequacy of Assessments*

■ In addition to attacking the general TEACCH methodology employed by defendant, plaintiffs also contend that defendant improperly failed to administer necessary assessments, as required by O.A.R. 581–015–0051(1) and 34 C.F.R. § 300.532(f). On the basis of this argument, they contend that the initial IEP's developed for M.'s first and second grade school years were procedurally flawed and resulted in the denial of FAPE to M.[13]

I disagree. Neither the OAR nor the C.F.R. applicable at the time the IEP's

were developed required any assessments beyond those that were conducted. As plaintiffs themselves point out, the OAR required only 1) an assessment of communication, including measures of language semantics and pragmatics completed by a speech and language pathologist, 2) assessments to determine the impact of the suspected disability on the child's educational performance, and 3) any additional evaluations or assessments necessary to identify the child's specific educational needs. At the time M.'s eligibility was established, the IEP team had before it a speech and language evaluation completed on January 3, 1994, by Debra Barnard, a speech and language pathologist. It also had assessments addressing the impact of M.'s autism on her educational performance, including a psychological evaluation conducted by Dr. Eugene Stubbs on March 2, 1994, who confirmed M.'s autism and described in detail her behavior in her educational environment. Ex. 48. In addition to these, the team had before it numerous additional documents, documenting the history of M.'s condition and education. *See* f.n.3 of this opinion for a complete list.

The C.F.R. provides only general guidelines regarding the assessments to be administered, giving school districts some discretion to determine what assessments may be necessary in a particular case. 34 C.F.R. § 300.532(f) provides that state educational agencies shall ensure that "[t]he child is assessed in all areas related to the suspected disability, including, *if appropriate,* health, vision, hearing, social and emo-

---

**13.** Plaintiffs also contend that the IEP's for M.'s kindergarten, third grade and fourth grade years were flawed. With respect to M.'s kindergarten year, I have already concluded that any claims relating to events that occurred during M.'s kindergarten year are time-barred. In addition, while the adequacy of the IEP's for M.'s third and fourth grade years are legitimately at issue in this opinion, plaintiffs do not argue that the flaws in these IEP's related to defendant's failure to conduct adequate assessments when M. initially entered the District. A full discussion of the adequacy of the IEP's developed for M.'s third and fourth grade years appears in section III. B. 2. c. and d. of this opinion.

tional status, general intelligence, academic performance, communicative status, and motor abilities" (emphasis added).

Plaintiffs insist that defendant failed to comply with this requirement, because it failed to conduct any assessments during the initial eligibility determination and development of M.'s first IEP. The section relied upon above, however, carries no such mandate; it requires only that the child "is assessed," not that the school district itself perform the assessment. As I have thoroughly reviewed, the IEP team had before it numerous assessments, including evaluations of M.'s diagnostic history, communication assessments, a psychological evaluation and a physical therapy evaluation. Thus, it is clear that at the time the 1995–96 IEP was developed, the team did what Ms. Skowron Gooch referred to as a "file review"—reviewing the available data in the file to determine an appropriate education plan for M. Furthermore, Ms. Skowron–Gooch, who had previous experience with M and ongoing communication with the coordinator of M.'s program at StepUp, was present at the initial meeting to help with the development of M.'s IEP objectives.

In addition, at least two experts reviewed the information available to the team and concluded that it was sufficient to develop an appropriate IEP for M. First, Dr. Seigel expressed her view that M. had "received much assessment," and concluded that the team had sufficient information to develop an appropriate IEP. *See* Tr. Vol. XI, 2143: 11–20. Similarly, Ms. Skowron–Gooch stated that because M. "had been involved in service over a number of years . . . there was pattern and history with it. So over her preschool years, quite a bit occurred. . . . [D]evelopmentally, her progress was not so fast that . . . [the] information would be outdated." Tr. Vol. V., 917:17–24.

In fact, there is evidence that defendant conducted more evaluations than were technically required under state and federal law. On January 25, 1996, for example, approximately halfway through M.'s first year at Four Corners, M.'s progress in the classroom was evaluated by Chuck McFerron, the autism specialist from MORS that was hired to consult with Steve Harland. Exhibit 73. At that time, Mr. McFerron identified tasks that M. had not yet developed, and included specific recommendations to improve her progress. His comments demonstrated a thorough familiarity with M.'s abilities and progress, as well as the specific methods implemented by Mr. Harland. Specifically, he stated that while M. had shown some progress in her communication skills through the use of visual cues, she was having difficulty consistently following her work schedule. He recommended, among other things, "an object cue/picture for [the] play area [because] she may need a more tangible cue." Exhibit 73, p. 1.

In sum, the evidence indicates that the IEP team had before it numerous assessments, spanning an 18–month period, during which a variety of evaluations were made. The IEP conducted a file review, and specified some particular documents on which it relied. The experts reviewing the available information have expressed their view that the information was more than sufficient to develop an appropriate IEP for M. I agree.

### 3. *Adequacy of Specific IEP's*

 Finally, plaintiffs challenge each of the specific IEP's developed by defendant for M., claiming that they were procedurally flawed and that the IEP's were not reasonably calculated to confer meaningful educational benefit. "The IEP is the basic mechanism through which th[e] goal [of providing a FAPE] is achieved for each

disabled child." *Murray v. Montrose County Sch. Dist. RE–1J,* 51 F.3d 921, 925 (10th Cir.1995); *see also* 20 U.S.C. § 1401(a)(20). It is "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." *Sch. Committee of Burlington v. Dept. of Educ.,* 471 U.S. 359, 368, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The IEP must include the child's present educational level and goals, specific services to be provided, needed transition services, and criteria for progress evaluation. 20 U.S.C. § 1401(a)(20). IDEA also ensures that parents are afforded a meaningful opportunity to participate in the formulation of the IEP, and receive notice of any proposed changes in their children's educational programs. 20 U.S.C. § 1415(b)(1)(C). Ultimately, the law requires only that the IEP in place "be reasonably calculated to confer a meaningful educational benefit on the child." *Adams v. State of Oregon,* 195 F.3d 1141, 1149 (9th Cir.1999). The Ninth Circuit has directed courts not to "judge an [IEP] in hindsight; [but] rather ... look to the [IEP's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [the child] with a meaningful benefit." *Id.*

### a. First Grade

Plaintiffs contend that M.'s 1996–97 IEP was flawed on several grounds, and asserts that these flaws resulted in a denial of FAPE. Specifically, plaintiffs claim 1) the IEP team did not include required members, 2) the IEP was not reasonably calculated to confer meaningful educational benefit, and 3) the IEP team failed to address and provide ESY services, which were necessary to ensure that M. did not experience unrecoverable regression during school breaks. Having carefully reviewed the parties' arguments, the findings of the

ALJ and the evidence before me, I find that M.'s 1996–97 IEP was reasonably calculated to confer meaningful educational benefit.

First, in developing M.'s IEP, defendant convened a team that included Mr. Harland, M.'s teacher, Charles McFerron, the MORS autism specialist, and M.'s parents. The district representative, Mr. Schrecengost, was not present at the meeting, as required by 34 C.F.R. § 300.343. Section 300.343(a)(1) requires the presence of a representative of the public agency "who is qualified to provide, or supervise the supervision of, special education." This procedural violation, however, did not result in a denial of FAPE. Mr. Schrecengost did sign the IEP form after the fact, authorizing the allocation of resources for M.'s program. More significantly, the district did arrange for a MORS autism specialist, Chuck McFerron, to be present at the meeting. Mr. McFerron was the autism specialist who had been overseeing M.'s program for the district, observing her in the classroom and consulting with Mr. Harland. Throughout M.'s kindergarten year, Mr. McFerron had observed M. on several different occasions, and prepared at least two reports that provided recommendations for continued work. Ex. 73. Furthermore, both Mr. Harland and Mr. McFerron were familiar with the variety of services and resources the school district had to offer. For these reasons, I find that the district's failure to include a district representative at the 1996–97 IEP meeting did not result in a denial of FAPE.

A review of the evidence indicates that the 1996–97 IEP team developed an IEP that was, at the time it was developed, reasonably calculated to provide meaningful educational benefit to M. In speaking of the IEP meeting, Mr. Harland explained that the team thoroughly discussed M.'s

progress and goals for the past year, in preparation for her first grade IEP. He stated:

> We began with discussing current levels of performance and how she had changed from the previous year's IEP, what goals she had met, what goals she had not met, or how much progress she had made. We then looked at skills, emerging skills that she had right now, and what we would like to do in the next year.

Tr. Vol. I, 71: 1–6. Mr. Harland went on to explain that while M. had not developed verbal skills, she was becoming proficient with visual cues. Therefore, his focus on the IEP and in the classroom was to develop her functional skills through visual learning. "[W]e were talking about her current level of performance, and how she is not imitating sounds ... so we are using ... more visual stuff. She was doing a very good job of pointing to what it was she wanted. She was doing a very good job of using picture cues, especially when it involved food or rewards, especially like in snack time." Tr. Vol. I, 77–78. He explained his reasoning in not emphasizing spoken language: "I wouldn't choose to do a task that she is unable to do. You certainly could not teach calculus before you can teach algebra. They have to have a foundation. Similarly, she was not in any way imitating verbal speech, or phonemes, so that is not a skill that we worked on specifically in this IEP. We were still working on the basic nature of communication, the basic language." Tr. Vol. I, 78: 16–24. Mr. Harland's characterization of M.'s ability is echoed by Dr. Seigel, who expressed her view at the administrative trial that M.'s program should not focus on verbal, but rather visual and functional, skills. "We have ample evidence that [M.] unfortunately is not able to acquire verbal communication, that being able to follow directions and indicate needs through the use of picture schedules ...

appear to me to have been part of her exposure to the TEACCH curriculum." Tr. Vol. I, 2142: 2–9.

After reviewing M.'s experiences during her kindergarten year, the 1996–97 IEP team developed an IEP that included five annual goals and fourteen short-term objectives. Included in the five annual goals were two communication goals, which emphasized expressive and receptive communication through visual cues. In addition, the IEP included goals for safety, social skills and motor skills. The IEP provided specific steps that would be taken to facilitate M. in reaching these goals, and identified "probe dates," during which M.'s progress would be evaluated. Finally, the IEP provided for continued MORS autism consultation, scheduled home reports and the use of "mild, consistent consequences" for M.'s performance in class.

The evidence indicates that M. made reasonable progress in her first grade year, given her developmental level. Dr. Seigel explains:

> I think there was progress, and I think there was things that could have been tweaked, but I also think that she made reasonable progress, given her overall developmental level, and the slowness at which she had been learning, up to that time, which you would predict that this would be a reasonable amount of progress, given what we already knew about her capacity to learn.... [S]he's clearly made some progress from the previous year.... [I]t's gone on from working simply on understanding routines to following the routines with a little bit higher degree of consistency and accuracy.... [I]t's clear that she has begun using the work systems and is using it to some extent.

Tr. Vol. IV, 751: 2–8; 755:1–7. Thus, there is evidence that M. did make reasonable progress during her first grade year,

given her developmental level. Even so, this is not the proper inquiry in evaluating the adequacy of M.'s IEP. IEP's are not to be judged in hindsight, based on the progress enjoyed by the child, but based instead on the IEP's "goals and goal achieving methods *at the time the plan was implemented.*" Adams v. State of Oregon, 195 F.3d 1141, 1149 (9th Cir.1999) (emphasis added). I have thoroughly reviewed the testimony of Mr. Harland, Mr. McFerron, and the other testifying experts, as well as the findings of the ALJ and the 1996–97 IEP itself, and find that the IEP, at the time it was developed, was reasonably calculated to confer meaningful benefit to M.

### b. Second Grade

Plaintiffs also attack M.'s second grade IEP, making similar arguments to those they make against M.'s first grade IEP: 1) the IEP team did not include required participants, and 2) the IEP was not reasonably calculated to confer meaningful educational benefit.

The adequacy of the IEP for M.'s second grade year presents the most difficult question before me. Defendant concedes, as it must, that the IEP team was procedurally flawed, in that there was no district representative in attendance who was "qualified to provide, or supervise the provision of, special education." Furthermore, unlike M.'s first grade year, Mr. McFerron, the autism specialist, also did not attend the IEP meeting. The only participants at the meeting were Mr. Harland, M's mother, a student teacher and one of M.'s private care providers, Gerrie Haney, leaving absent any individual who could oversee the provision of services on behalf of the district.

Procedural flaws, in and of themselves, do not necessarily warrant a finding that the child was denied FAPE. Only if a procedural violation results in the loss of educational opportunity or seriously in-

fringes on the parents' opportunity to participate in the IEP formulation process does the school fail to provide FAPE. *W.G. v. Bd. of Trustees of Target Range Sch. Dist.,* 960 F.2d 1479, 1484 (9th Cir.1992) (internal citations omitted). Thus, the key issue here is whether the absence of a district representative at the IEP meeting resulted in the denial of educational opportunity for M. or deprived her parents the opportunity to meaningfully participate in the development of her IEP.

I conclude that it did. In the absence of a district representative, or at the very least, someone like Mr. McFerron who had observed M. in class and was familiar with M.'s skills and her program at the district, M.'s parents were effectively forced to accept whatever information given to them by Mr. Harland. They had no other individual with authority who could address any concerns they might have had involving M.'s program, including Mr. Harland's teaching style and his areas of emphasis or lack thereof, or the availability of other resources or programs within the district. As plaintiffs point out, a district representative might have provided some additional insight into the appropriateness of the goals and objectives in M.'s IEP, teaching methods, or M.'s progress. Because the district failed to ensure that a knowledgeable representative of the district was present, the plaintiffs were denied the opportunity to discuss critically the services that had been provided and the resources available for change. Additionally, M. was likely denied educational opportunity that could have resulted from a full consideration of available resources in relation to M.'s skills in the development of her second grade IEP.

In addressing the importance of procedural compliance in *Rowley,* the Supreme Court declared:

[W]e think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process ... as it did upon the measurement of the resulting IEP against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP ... would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Rowley*, 458 U.S. at 205, 102 S.Ct. 3034. I agree that the "full participation of concerned parties throughout the development of the IEP" is crucial to the development of an appropriate IEP. Such participation was seriously lacking in the development of M.'s 1997–98 IEP. Thus, while the mere existence of a procedural flaw does not in itself result in a deprivation of FAPE, in this case, I conclude that FAPE was denied. The district's failure to include a district representative as part of the IEP team was a procedural violation that deprived M.'s parents an opportunity to meaningfully participate in the IEP process and deprived M. of educational opportunity.

### c. Third Grade

While plaintiffs admit that M.'s program improved dramatically when she began her third grade year, they nevertheless challenge the adequacy of M.'s third and fourth grade IEP's. On three bases, plaintiffs assert that the 1998 99 was inadequate: 1) the regular education teacher was not present at the IEP meeting; 2) defendant did not assign an aide specifically to supervise M. throughout the entire school day; 3) defendant did not place sufficient emphasis on the development of M.'s functional skills at home and in the community; and 4) defendant improperly concluded that M. was not entitled to ESY services. I disagree with plaintiffs' assertion.

For her third grade year, M.'s IEP team consisted of 1) Steve Harland, 2) Lynda McCarthy, a special education coordinator, 3) Lynda Bonnem, a special education coordinator, 4) Chuck McFerron, a MORS autism specialist, 5) Beverly Kropp, a program assistant, 6) Roxanne Warren, an autism specialist, and 7) M.'s parents. The 1998–99 IEP was developed over several days and constituted several meetings. The IEP team members were present at these meetings, to address the implications of two recent evaluations and implement appropriate changes in M.'s program. All of the meetings were documented, and several drafts of possible goals and objectives were circulated and discussed. Steve Harland, who had been M.'s teacher for her first three years at Four Corners, attended all of the meetings. Julie Wells, her teacher at Morningside, attended all of the preparatory meetings, and signed the IEP form after the fact, indicating that she had reviewed the final IEP and was familiar with M.'s education plan. The failure of Ms. Wells to actually attend the IEP meeting thus did not significantly affect the resulting IEP or her ability to implement it in the classroom. This is evidenced by the testimony of Ms. Pitchford herself, who stated that M. demonstrated "huge progress" during her third grade year. *See* Tr. Vol. XII, 2494: 16–17.

Furthermore, while the district did not specifically assign a one-on-one aide for M.'s third grade year, the evidence indicates that the level of supervision provided was clearly sufficient to provide FAPE. Shelley Kennon, the teacher, testified that M. virtually always had an aide assigned to

her throughout the day, and was subject to one-on-one supervision. *See* Tr. Vol. XIII, 2641–2646, 2654. The district also provided for at least 12.5 hours per week of 1:1 discrete trials, during which time she would both receive direct supervision and direct instruction, which plaintiffs themselves had requested. Finally, when M. encountered a safety hazard in September of 1998, the district actually revised the 1998–99 IEP to provide for full-time supervision, and it was therefore mandated by the IEP almost from the beginning of the school year. In light of these findings, I conclude that the district's initial failure to include 1:1 supervision in M.'s 1998–99 IEP, did not deprive M. of FAPE.

Finally, the evidence does not support plaintiffs' assertion that the IEP provided inadequate services for functional skills development. In addition to the intensive discrete trials provided throughout her third grade year, M. received training in occupational therapy, safety, physical education, social interaction and daily living. Again, Ms. Pitchford herself reflected that M. enjoyed "huge progress" during her third grade year. In fact, in their trial memorandum, plaintiffs reflect that M.'s program improved substantially at that time, resulting in tremendous progress for M.:

> [S]lightly more than one year after M. began receiving 1:1 instruction relying primarily on massed discrete trial methods, M. had acquired the ability to attend to others in her environment and to imitate and, building on these skills, had acquired a functional receptive vocabulary, had learned how to use symbols to express her needs and wants, had eliminated self-injurious behaviors, and had learned to respond to others self-stimulatory behaviors.

Plaintiffs' Trial Memorandum at 39.

What becomes abundantly clear from statements such as these is that they have a fundamentally mistaken view of the role of the district. It is not the role of the school or the district to maximize the child's potential; such a goal is unreasonable and likely unattainable, in light of the broad services schools are obligated to provide. The schools are necessarily institutions that must cater to the needs of an extraordinary number of children, and the corresponding diversity of needs, abilities, personalities and backgrounds of those children. It is likely not possible to design an education plan that both takes into account the individual needs of each child *and* maximizes the children's abilities, and no such duty has been imposed. The schools must only identify the unique needs of each child, and then develop a plan that provides a "basic floor of opportunity" to each child. *Rowley,* 458 U.S. at 201, 102 S.Ct. 3034. If parents desire something more than this "basic floor," which is certainly understandable, and even laudable, they are free to take on that responsibility for themselves. But to attempt to impose such a burden on the school district is both impracticable and beyond the mandate of the law.

Finally, I find that defendant properly dealt with the issue of ESY services during M.'s 1998–99 IEP. Plaintiffs do not dispute that the issue was raised at the IEP meeting. Instead, they contend that the district concluded incorrectly that M. was not entitled to such services. The evidence, however, does not support their claim. Mr. Harland had taken data during M.'s second grade school year to determine whether substantial regression occurred after break periods. Ex. 132. He found that it did not. He also noted that M. was not at a point at which an emerging skill needed immediate and intensive attention to develop properly. He explained these findings to the IEP team, which then discussed whether ESY services were warranted for the six-week break during the

summer of 1998. The team found, based on this information, that they were not. While the parents did not agree with this conclusion, it was based on observations that indicated that M. would not significantly regress during the break period, followed by a thorough discussion among the members of the IEP team regarding M.'s unique needs. That is the key requirement under the law, and it was clearly complied with here. *See Adams*, 195 F.3d at 1150 (holding that a determination of the proper ESY services must be "contemplated by the child's [IEP] and linked to his or her developmental goals").

For the reasons stated above, I find that M.'s third grade IEP was in all respects reasonably calculated to confer meaningful educational benefit, and did in fact provide M. with FAPE.

#### d. Fourth Grade

Plaintiffs challenge M.'s fourth grade IEP on the same grounds as her third year. I find their arguments unpersuasive. While it is true that a regular education teacher did not attend the IEP meeting, the meeting was attended by seven individuals, including Pat Dixon, a speech and language pathologist, Roxanne Warren, Karen Jordan, a MORS autism specialist, Shelley Kennen, a special education teacher, and Lynda McCarthy, a district representative and special education coordinator. The parents received notice of the meeting, and Ms. Pitchford participated fully. The team assigned a 1:1 aide to M., provided for increased specially designed instruction, discrete trials and pivotal response training, and included consultation services. The IEP also included life skills goals to add generalization in the home and community.

At the administrative trial, Ms. Pitchford herself expressed her view that aside from the issue of whether a 1:1 aide was assigned, the 1999–2000 IEP was appropriate. *See* Tr. Vol. XII, 2496. Plaintiffs'

expert, Dr. James Mulick, echoes this sentiment, stating that the only improvement that could be made to M.'s third grade program would be to supplement it with additional home services. He stated: "I would be remiss if I failed to point out that the degree of cooperation evidence between [M.'s] parents and the home program personnel and school personnel is both good and meaningful. I believe that the resulting program is on the verge of achieving exemplary status." Ex. 346 at 22. Finally, it is not disputed that M. made substantial progress during her fourth grade year. Therefore, given the lack of evidence of any inadequacies in M.'s fourth grade program that resulted in harm to her, I conclude that the district did not fail to provide M. with FAPE during her fourth grade year.

I also conclude that the ESY services provided to M. for the summer of 1999 were adequate. As I have reviewed, M. was provided with five weeks of extended services. The services were conducted by Gerrie Haney, a caretaker and teacher previously hired by plaintiffs who was later hired by the district to continue working with M. As part of M.'s curriculum, Ms. Haney utilized drills, which plaintiffs had requested. While the district could have provided more supplemental services, the evidence indicates that the services provided were reasonably calculated to prevent regression, and that they did in fact do so. Accordingly, I conclude that these services were adequate.

### C. Compensatory Education and Tuition Reimbursement

Apparently in light of the ALJ's finding that the district provided FAPE to M. in all respects, plaintiffs have not addressed in detail the amount of compensatory education and tuition reimbursement to which they would be entitled. I will at this time

defer ruling on the issue of damages, pending the outcome of mediation and the resolution of other remaining matters, but will order briefing on this issue if and when the need arises.

## IV CONCLUSION

In sum, I find that M.'s IEP's for the 1996–97 school year, the 1998–99 school year, and the 1999–2000 school year were reasonably calculated to confer meaningful educational benefit, and did not deprive M. of FAPE. The 1997–98 IEP, however, was sufficiently flawed to deprive M. of FAPE during that school year. As is explained more fully herein, the court defers ruling on the adequacy of M.'s kindergarten year and the adequacy of the district's treatment of ESY services prior to M.'s third grade year.

In light of the substantial findings contained in this opinion, the parties are hereby ordered to mediation to attempt to reach an agreement that will obviate the need for further litigation. The parties are to report back to the court regarding the progress of mediation within ninety (90) days of the issuance of this order. At that time, the court will issue any orders it deems appropriate, including an order extending mediation or an order requiring further briefing on remaining issues.